IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TYRONE WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 17 C 3893 |
| v. ) | |
| ) | Hon. Jorge L. Alonso |
| GHALIAH OBAISI, as Independent Executor ) | |
| of the Estate of SALEH OBAISI, and ) | |
| WEXFORD HEALTH SOURCES, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Tyrone Williams, a prisoner in the Illinois Department of Corrections ("IDOC"), filed a two-count complaint against Defendants Dr. Saleh Obaisi, and Wexford Health Sources, Inc. ("Wexford"), pursuant to 42 U.S.C. § 1983, alleging defendants violated his Eighth Amendment rights in treating him for a shoulder injury.[1] Defendants have moved for summary judgment. For the reasons that follow, the Court grants Defendants' motion for summary judgment [86].

## BACKGROUND

Defendants submitted a Local Rule 56.1 statement of material facts ("SOF") along with their motion for summary judgment. (*See* Defs.' LR 56.1 SOF, ECF No. 88.) Williams submitted a response to defendants' SOF, which admitted all facts put forward by defendants and did not assert any additional facts upon which Williams relies in opposing summary judgment. (*See* Pl.'s LR 56.1 Resp., ECF No. 90.) Accordingly, no dispute of fact exists, and the Court takes the following facts from the Defendants' SOF and supporting exhibits.

---

[1] Dr. Obaisi died in December 2017 after Williams filed the instant action. Williams thereafter substituted Ghaliah Obaisi, who is the independent executor of Obaisi's estate, as defendant in place of Dr. Obaisi. (*See* ECF Nos. 31 and 35.)

1

Since 1983, Tyrone Williams has been a prisoner in the Illinois Department of Corrections ("IDOC"). Williams has resided at IDOC's Stateville Correctional Center since April 2012. (ECF No. 88 at ¶ 1.) Defendant Wexford is a private corporation that contracts with IDOC to provide medical care to inmates at Stateville. (*Id.* at ¶ 2) Defendant Dr. Obaisi was employed by Wexford as Stateville's medical director and provided medical care to Williams for a left shoulder injury during the relevant time period. (*Id*. at ¶¶ 3, 7.)

Sometime between 2003 and 2005, Williams injured his left shoulder while weightlifting; he suffered chronic intermittent pain in his shoulder thereafter but was okay without pain medication or treatment through about 2013. (*Id*. at ¶ 7.) After he was transferred to Stateville in 2012, Williams first reported an injury to his left shoulder around October 17, 2013 and was thereafter scheduled to be seen by a nurse. (*Id*. at ¶ 8.) On October 25, 2013, a nurse saw Williams. Williams reported "off and on" pain and weakness when he did push-ups; the nurse prescribed him Tylenol and referred him to see a physician. (*Id*. at ¶ 9.) Williams missed two appointments thereafter, opting instead to see family visitors. (*Id*. at ¶ 10.)

On January 17, 2014, Williams saw a nurse again and complained that his shoulder gave out while climbing out of his top bunk; the nurse prescribed ibuprofen and scheduled Williams again to see a physician. (*Id*. at ¶ 11.) Williams' appointment had to be rescheduled due to a lockdown at Stateville, and on February 11, 2014, Williams was seen by Physician's Assistant Claude Owikoti, who diagnosed Williams with moderate degenerative joint disease ("DJD") in his left shoulder. (*Id*. at ¶¶ 12-13.) DJD is commonly referred to as "arthrosis" and is inflammation in the joints that causes pain and stiffness and usually worsens with age. (*Id*. at ¶ 13.) PA Owikoti provided Williams a medical permit to be assigned a lower bunk. (*Id*.)

On April 11, 2014, Defendant Dr. Obaisi saw Williams for the first time for complaints of pain in Williams' left shoulder and right knee. (*Id*. at ¶ 14.) Dr. Obaisi examined Williams, noted he could lift his left arm up to a 90-degree angle, and ordered X-rays on Williams' shoulder and knee. (*Id*.) Williams had X-rays taken on April 15, 2014, which showed he had advanced DJD. (*Id*.) Dr. Obaisi saw Williams again on April 24, 2014 to discuss the results of the X-rays and prescribed Williams Naprosyn, a non-steroidal anti-inflammatory drug ("NSAID") that is commonly used to treat DJD. (*Id*. at ¶ 15.)

On June 15, 2014, PA Owikoti saw Williams after Williams complained of pain in his left shoulder and one of his fingers. (*Id*. at ¶ 18.) PA Owikoti prescribed another NSAID, Mobic, and analgesic balm ointment, a topical pain reliever used to treat joint and muscle pain. (*Id*.)

On November 12, 2014, Dr. Obaisi saw Williams again, and Williams reported stiffness in his left shoulder. After noting Williams could lift his left arm to a 90-degree angle, Dr. Obaisi injected Williams' left shoulder joint with Depomedrol, a cortisteroid commonly used to treat stiffness and pain associated with DJD. (*Id*. at ¶ 19.) On January 21, 2015, Dr. Obaisi gave Williams another cortisteroid injection in his left shoulder joint and renewed Williams' low bunk permit for another year. (*Id*. at ¶ 20.) On February 29, 2015, Williams saw a nurse for further complaints of shoulder pain, and the nurse noted that "MD" ordered ibuprofen 600mg for 30 days for Williams. (*Id*. at ¶ 21.)

On April 21, 2015, Dr. Obaisi saw Williams again to treat his left shoulder. Williams reported that his left shoulder movement was still limited, and Dr. Obaisi referred Williams for an orthopedic evaluation. Dr. Obaisi also noted that "steroid injection[s] not helping." (*Id*. at ¶ 22.)

Following Dr. Obaisi's referral, Williams saw Dr. Benjamin Goldberg, an orthopedic specialist, on June 22, 2015. Dr. Goldberg ordered X-rays and a MRI be taken of Williams'

3

shoulder. Dr. Goldberg also recommended Williams start physical therapy for his shoulder at Stateville. (*Id*. at ¶ 23.) Dr. Goldberg later testified that Williams' shoulder condition did not require urgent or emergency medical care. (*Id*. at ¶ 47.) Pursuant to Dr. Goldberg's recommendation, Dr. Obaisi referred Williams to physical therapy on June 25, 2015. (*Id*. at ¶ 24.) On the same day, Williams was seen by physical therapist Jose Becerra, who recommended one to two physical therapy sessions per week for four to six weeks. However, when Williams did not show up for two physical therapy sessions on June 30, 2015 and July 2, 2015, Becerra discharged him from physical therapy and provided Williams with a home exercise plan. (*Id*.)

Also on June 25, 2015, Dr. Obaisi requested a MRI for Williams' shoulder pursuant to Dr. Goldberg's recommendation, and Williams had a MRI taken on October 30, 2015. (*Id*. at ¶¶ 25-26.) The MRI revealed Williams had a "glenhumeral osteoarthritis" and a "partial thickness tear of the supraspinatus tendon." (*Id*.) On November 20, 2015, Williams saw Dr. Goldberg to discuss the results of the MRI. Dr. Goldberg gave Williams several treatment options, including "reverse total shoulder arthroplasty surgery" (i.e., total shoulder replacement surgery), and Williams opted to have the surgery, which was performed on February 15, 2016. (*Id*. at ¶¶ 27-28.)

Following surgery, Dr. Obaisi placed Williams in the Stateville infirmary so that his condition could be monitored. (*Id*. at ¶ 28.) Dr. Obaisi also referred Williams to physical therapy and prescribed Williams pain medication, Norco and Tylenol #3, for two weeks. (*Id*.) Dr. Obaisi discharged Williams from the infirmary on March 28, 2016. (*Id*. at ¶ 34.) From February 2016 through October 2016, Williams was seen by Dr. Obaisi, Dr. Goldberg, and PT Becerra for follow-up appointments, during which they generally observed that Williams was recovering well from the shoulder surgery. (*Id*. at ¶¶ 30, 32-38.) At a July 2016 follow-up evaluation, Dr. Goldberg noted that Williams' range of motion was improving, his pain was decreasing, and he was clear to

4

resume physical activities like push-ups. (*Id.* at ¶ 37.) Dr. Goldberg also noted a "prominent acromion" (i.e., the end portion of the left shoulder blade) but stated that it was not a significant functional detriment nor was it something that would be treated with additional surgery. (*Id.*)

On October 26, 2016, Williams saw Dr. Obaisi again for continued complaints of shoulder pain. After examining him, Dr. Obaisi prescribed Mobic for 60 days. (*Id.* at ¶ 39.) Williams saw Dr. Obaisi again on January 10, 2017 for shoulder pain, and Dr. Obaisi prescribed Tylenol for 30 days as well as X-rays on Williams' left shoulder. (*Id.* at ¶ 40.) Dr. Obaisi saw Williams again on January 24, 2017 for a follow-up to discuss the X-rays; Dr. Obaisi noted William's surgical implants were in good position and prescribed Mobic for another 60 days. (*Id.* at ¶ 41.)

Following his surgery and at Dr. Obaisi's direction, Williams had done physical therapy for his shoulder through January 2017, attending 45 of 51 scheduled appointments. (*Id.* at ¶¶ 30-31.) Williams' final physical therapy session was on January 30, 2017, and PT Becerra states that Williams had made significant gains, that Williams had no significant functional defects, and that "most people would have been satisfied" with the progression Williams had made after surgery. (*Id.* at ¶ 42.) Becerra discharged Williams and provided him with a home exercise plan. (*Id.*)

On February 15, 2017, Dr. Obaisi saw Williams for a post-physical therapy evaluation, and Williams again reported continued pain and stiffness in his left shoulder. (*Id.* at ¶ 43.) Dr. Obaisi referred Williams back to Dr. Goldberg for an evaluation, which ultimately took place on September 15, 2017. (*Id.* at ¶¶ 43, 47.) Before the appointment, Dr. Obaisi saw Williams three more times. (*Id.* at ¶¶ 44-45.) The first visit, in March, was a follow-up to advise Williams he would be seeing Dr. Goldberg and to renew Williams' permit for a lower bunk. (*Id.* at ¶ 44.) During the two later visits, there is no record that Williams complained of any issue relating to his left shoulder. (*Id.* at ¶ 45.) When Dr. Goldberg saw Williams in September 2017, Dr. Goldberg noted

5

that Williams reported he was doing well and that Williams' shoulder had "excellent range of motion" and "relatively well-preserved strength." (*Id.* at ¶ 46.) Dr. Goldberg also took X-rays of Williams' shoulder, which showed the surgical implants were well-seated with no signs of loosening. (*Id.*) Dr. Goldberg also later testified that the nonsurgical care provided to Williams by Dr. Obaisi and others before his surgery was reasonable and that the decision of when to resort to surgery is always made on a case-by-case basis. (*Id.* at ¶ 49.) Dr. Goldberg also testified that, if Williams had a post-surgical follow-up visit sooner, it would have had no effect on his recovery. (*Id.* at ¶ 50.)

Defendants also offer the expert testimony of Dr. Chadwick Prodromos, an orthopedic surgeon. (*Id.* at ¶¶ 54-59.) Dr. Prodromos opined that the care Williams received for his left shoulder, including the care Williams received after surgery, was "reasonable, compassionate, and well within the standard of care." (*Id.*) More specifically, Dr. Prodromos opined that it was reasonable to hold off on performing surgery on Williams' shoulder for a number of reasons and that the delay did not cause Williams' condition to substantially change or cause a change in available treatment options. (*Id.* at ¶ 56.) Finally, Dr. Prodromos opined that the bump on Williams' shoulder (i.e., the "prominent acromion") did not represent a surgical complication or problem, did not require treatment, and should not produce pain. (*Id.* at ¶ 59.)

## **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016); *Kvapil v. Chippewa Cty.*, 752 F.3d 708,

6

712 (7th Cir. 2014). At the summary-judgment stage, the court does not make credibility determinations, weigh evidence, or decide which inferences to draw from the facts; those are jury functions. *See Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014). But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"A party that does not bear the burden of persuasion [at trial] may move for summary judgment by showing—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)) (quotations omitted). If the moving party makes such a showing, "the nonmoving party bears the burden of production under Rule 56 to designate specific facts showing that there is a genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). The nonmoving party "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) . . . to demonstrate that there is evidence upon which a jury could proceed to find a verdict in [his] favor." *Modrowski*, 712 F.3d at 1168-69 (quotations and citations omitted).

## DISCUSSION

Section 1983 creates a cause of action against any person who, under color of state law, "subjects or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." U.S. Const. Amend. VIII. Williams brings a claim against Defendant Dr. Obaisi, arguing he violated his Eighth Amendment rights because Dr. Obaisi was deliberately indifferent to a serious medical

7

need, *i.e.*, Williams' shoulder injury (Count I). Williams brings a *Monell* claim against Defendant Wexford, arguing that Wexford had policies of delaying and minimizing medical treatment of inmates at Stateville Correctional Center in an effort to increase profits and that these policies also violated Williams' Eighth Amendment rights (Count II). The Court addresses each claim in turn.

**I.      Dr. Obaisi**

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Cruel and unusual punishment includes the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Because an inmate like Williams "must rely on prison authorities to treat his medical needs" and because "denial of medical care can result in pain and suffering" that serves no penological purpose, "deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Id.* at 103-04 (quotations and citations omitted).

An Eighth Amendment "deliberate indifference" claim has both an objective component and a subjective component; a plaintiff must show (1) an objectively serious medical condition; and (2) an individual defendant's deliberate indifference to that condition. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Here, defendants do not attempt to argue that Williams' left shoulder injury cannot amount to a "serious medical condition," (*See* Defs.' Memo. in Support, ECF No. 87 at 4-10), so the Court assumes Williams has met the objective prong of his deliberate indifference claim.

The second prong examines a defendant's subjective state of mind and requires a plaintiff to prove the defendant "knows of and disregards an excessive risk to inmate health or safety." *Vance v. Peters*, 97 F.3d 987, 991-92 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837). "The

8

requirement of subjective awareness stems from the Eighth Amendment's prohibition of cruel and unusual *punishment*; an *inadvertent* failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain." *Zaya v. Sood*, 836 F.3d 800, 804-05 (7th Cir. 2016) (quoting *Estelle*, 429 U.S. at 105). Williams need not show that Obaisi "intended harm or believed that harm would occur…[b]ut showing mere negligence is not enough." *Petties*, 836 F.3d at 728 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")). "Neither medical malpractice nor mere disagreement with a doctor's medical judgment" is sufficient to establish deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728. Rather, a plaintiff must present evidence that allows for the reasonable inference that the defendant actually knew of a serious medical condition and disregarded it.

Defendants argue summary judgment is appropriate because Williams cannot show Dr. Obaisi was deliberately indifferent in treating Williams' left shoulder injury. Defendants point to a record showing Dr. Obaisi diagnosed and attempted to treat Williams' injury with a variety of non-surgical options—pain medication, steroid injections, activity restrictions, and a low bunk permit—before referring Williams to an outside specialist for surgery and then monitoring Williams' recovery thereafter, and Defendants offer expert testimony that Dr. Obaisi's course of treatment was reasonable under the circumstances. (ECF No. 87 at 4-10.) As such, Defendants argue Williams' claim amounts to mere disagreement with Dr. Obaisi's medical judgment, which cannot form the basis of a deliberate indifference claim. *See Berry v. Peterman*, 603 F.3d 435, 441 (7th Cir. 2010).

9

In opposing summary judgment, Williams argues Dr. Obaisi was deliberately indifferent to his shoulder injury because Dr. Obaisi persisted in the same course of treatment for three years despite knowing the course of treatment was ineffective. (*See* Pltf.'s Resp., ECF No. 89 at 3-5.) More specifically, Williams argues that Dr. Obaisi should have ordered X-rays or a MRI on Williams' shoulder "after initial treatment proved fruitless" and that Dr. Obaisi's "failure to do so likely exacerbated Williams' degenerative joint disease ['DJD'] and either led to Williams' rotator cuff tear or caused it to worsen." (*Id.* at 5.) As proof, Williams points to the fact that he had to have a reverse shoulder arthroplasty as opposed to a standard shoulder arthroplasty. (*Id.*)

A plaintiff like Williams can escape summary judgment by presenting evidence that a defendant doctor "doggedly persist[ed] in a course of treatment known to be ineffective," *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005), or delayed in providing treatment which exacerbated a serious medical condition or caused needless suffering. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (noting claim based on delay must also include "verifying medical evidence" that plaintiff suffered harm as a result of the delay); *see also Petties*, 836 F.3d at 730 (noting whether delay gives rise to viable claim also depends on circumstances like seriousness of condition and ease of providing treatment). But Williams fails to produce evidence supporting either theory of liability.[2]

Williams does not offer any evidence showing that Dr. Obaisi persisted in the same course of treatment despite knowing it was ineffective. Specifically, Williams argues that Dr. Obaisi followed the same course of treatment for "three years, without any result," before ultimately

---

[2] Although Williams mostly relies on portions of the record highlighted by defendants in their SOF, it appears Williams does cite some additional portions of the raw record, in violation of LR 56.1(b)(3)(C). As defendants point out in their reply, the Court has the discretion to ignore these additional, improperly raised facts but declines to do so. *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005). Even considering these additional facts, summary judgment is still appropriate.

10

referring Williams to an outside specialist, Dr. Goldberg, who performed shoulder surgery. (ECF No. 89 at 4.) First, it is undisputed that Dr. Obaisi saw Williams for the first time on April 11, 2014 and referred him to Dr. Goldberg on April 21, 2015, a period of just over a year (not three years).[3] (ECF No. 88 at ¶¶ 14, 22.) Second, Williams does not dispute that Dr. Obaisi tried a variety of non-surgical treatments before referring Williams to an outside specialist. Dr. Obaisi's treatment included taking X-rays, renewing a low bunk permit, and prescribing pain medication, NSAIDs and cortisteroid injections to address Williams' shoulder pain. (*Id.* at ¶¶ 14-22.) The facts presented to the Court show not only did Dr. Obaisi's care differ from the treatment previously provided by other staff at Stateville (consisting of pain medication like ibuprofen, acetaminophen, and another NSAID), but also Dr. Obaisi's care evolved over the time period that he treated Williams. Further, defendants' expert, Dr. Prodromos, offered unrebutted testimony that Dr. Obaisi's treatment was reasonable under the circumstances and that shoulder surgery for a patient like Williams should come after non-surgical options are attempted. (*Id.* at ¶¶ 55-56.) Further still, Dr. Goldberg, who treated Williams and performed his shoulder surgery, offered testimony consistent with Dr. Prodromos' opinions. (*Id.* at ¶¶ 48-49.) Based on these facts, no reasonable jury could find that Dr. Obaisi persisted in a course of treatment known to be ineffective in such a way as to support an Eighth Amendment claim.

Moreover, Williams fails to provide evidence of any sort of "inexplicable delay" in treatment that could support a deliberate indifference claim against Dr. Obaisi. *Petties*, 836 F.3d at 730. Williams argues that "Dr. Obaisi should have ordered an x-ray or MRI of Williams'

---

[3] To the extent Williams argues Dr. Obaisi is individually responsible for care provided by others at Stateville, Williams offers no legal or factual support for this argument. Further, Williams focuses only on the treatment provided by Dr. Obaisi and does not make any argument or present evidence that Dr. Obaisi's role as Stateville medical director somehow made him aware that the treatment Williams was receiving was ineffective.

11

shoulder after the initial treatment proved fruitless" and that his "failure to do so likely exacerbated Williams' [DJD] that either led to Williams' rotator cuff tear or caused it to worsen." (ECF No. 89 at 5.) This argument ignores that Dr. Obaisi ordered X-rays on Williams' shoulder during his initial evaluation of Williams. (ECF No. 88 at ¶ 14.) Also, it ignores the non-surgical treatments Dr. Obaisi tried over the course of four visits with Williams before Dr. Obaisi referred Williams to Dr. Goldberg—non-surgical treatments that, again, Williams admitted were reasonable under the circumstances. (*Id*. at ¶¶ 14-15, 19-20, 22, 55-56.) Williams appears to argue that the fact that he ultimately underwent a reverse shoulder arthroplasty, as opposed to a standard shoulder arthroplasty, is proof that his condition worsened due to the delay in Dr. Obaisi referring him to an outside surgeon. (ECF No. 89 at 5.) Even assuming this fact could allow a juror to infer that Williams' shoulder grew worse during the relevant time period—a dubious proposition given that Williams points to no evidence whatsoever showing how or why the procedures differ—such an inference would be unreasonable given that Williams *does not dispute* Dr. Prodromos's expert opinion that the gap between when Dr. Obaisi began treating Williams in 2014 and Dr. Obaisi's surgical referral in 2015 "did not adversely affect [Williams'] in any way." (ECF No. 90 at ¶ 57.) "Of course, delays are common in the prison setting with limited resources," *Petties*, 836 F.3d at 730, and Williams puts forward no evidence that the delay between when Dr. Obaisi began treating him and when Williams ultimately received shoulder surgery resulted in any needless suffering.

Finally, Williams puts forward no other facts showing that Dr. Obaisi's treatment before surgery amounts to deliberate indifference, and Williams does not contest defendants' position that Dr. Obaisi's treatment post-surgery was reasonable. If there is evidence in the record that creates a genuine dispute of material fact or otherwise defeats summary judgment, Williams has failed to highlight it, and it is "not the duty of the district court to scour the record in search of

12

material factual disputes." *See Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414-15 (7th Cir. 2019); *see also Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotation marks and citations omitted). Accordingly, the Court grants summary judgment in favor of Defendant Dr. Obaisi.

**II.     Wexford**

The Court also finds that summary judgment is appropriate on Williams' *Monell* claim against Defendant Wexford. Under § 1983, a defendant like Wexford can be held liable if it has a policy or practice that causes a constitutional violation. *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (observing *Monell* extends to private entities like Wexford). To establish his *Monell* claim, Williams must ultimately prove that an (1) official Wexford policy, (2) a widespread custom or practice, or (3) an action by a Wexford official with policy-making authority was the "moving force behind his constitutional injury." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016); *see also McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000).

Again, Williams alleges that Wexford had unconstitutional policies of delaying and minimizing medical treatment of Stateville inmates to increase profits. More specifically, Williams argues "genuine factual issues exist as to whether (1) Wexford maintained cost-cutting policies which caused medical care for Williams to be withheld or delayed; (2) Wexford maintained widespread practices of inaction, which caused medical care to be withheld or delayed; and (3) those policies or practices resulted in an unnecessary exacerbation of Williams' injury and prolonged his pain and discomfort." (ECF No. 89 at 6.)

13

Apart from the generalized argument in his response and the allegations in his amended complaint, Williams offers nothing in support of his claim. As it stands, the only evidence of any Wexford policy is put forth by the defendants and pertains to how Wexford handles requests for non-emergency medical care, and it is undisputed that Williams did not require emergent or even urgent medical care for his left shoulder. (ECF No. 88 at ¶¶ 5-6, 47.) This evidence does not show—or even create a jury question—that Wexford employed the sort of policies and practices about which Williams complains. And importantly, Williams does not cite anything in the record—in his response brief or his response to Defendants' SOF—purporting to show an official or unofficial policy of delay and inaction that was the moving force behind the violation of his Eighth Amendment rights. Again, it is not the duty of this Court to search the record to find such evidence. *Albrechtsen*, 309 F.3d at 436. "As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

When viewing the evidence put forward by defendants in a light most favorable to Williams, the only evidence that could support Williams' *Monell* claim is the treatment he received for this shoulder. But again, Williams fails to show what portions of the care he received over a period of more than three years evidence Wexford's unconstitutional policies. And even assuming Williams could make such a showing, an individual plaintiff's treatment, on its own, is generally not sufficient to escape summary judgment; a plaintiff must show his experience is similar to others or provide testimony or circumstantial evidence generally showing deficiencies in treatment from which an unconstitutional policy can be inferred. *See Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 796 (7th Cir. 2014) (affirming summary judgment where plaintiff could only point to

14

his own experiences and finding "[s]uch isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to Shields' needs"); *Perez v. Wexford Health Sources, Inc.*, No. 17 C 8386, 2019 WL 5788073, at *8 (N.D. Ill. Nov. 6, 2019) (granting summary judgment in favor of Wexford where plaintiff "failed to present evidence outside of his own experience"); *cf. Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) (denying summary judgment where, in addition to personal experience, plaintiff offered jail employee testimony about systematic delays in treatment and delays inherent in treatment procedures); *Daniel*, 833 F.3d at 735 (noting testimony from jail medical staff describing various inadequacies of Cook County jail health care). This ensures the plaintiff's experience is due to a policy "rather than a random event." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303-06 (7th Cir. 2010) Williams fails to produce any such evidence here, and accordingly, the Court grants summary judgment in favor of Defendant Wexford.[4]

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment [86] is granted. Civil case terminated.

**SO ORDERED.**  ENTERED: **August 25, 2020**



**HON. JORGE ALONSO**
**United States District Judge**

---

[4] Although Dr. Obaisi was the Stateville medical director, Williams fails to support a *Monell* claim under the "policy-maker" theory because, as explained above, Williams fails to show Dr. Obaisi's actions were unconstitutional. Also, because the Court finds summary judgment is appropriate here, it need not address the parties' arguments regarding punitive damages.